McKEE, Chief Judge,
concurring.
Although I agree that Cheruku is inadmissible for adjustment of status under a strict interpretation of 8 U.S.C. § 1182(a)(9)(B)(i)(II) as explained by my colleagues, I write separately because the result we must reach is as unjust as it is unreasonable.[1]
Cheruku is an educated software engineer who is employed and her employer is trying to help her remain in the United States. (A.R. 66, 333). She is a highly skilled professional who, according to her employer, is engaged in “research, design, and development] [of] software and programs for high tech medical, industrial, scientific, financial business applications, leading] teams of programmers and systems analysts in projects,” and “developing] and directing] systems testing procedures, programming and documentation.” (A.R. 258). She has no criminal record, nor can she be characterized as the type of “recidivist immigration violator” that Congress appropriately seeks to exclude from this country. 8 U.S.C. § 1182(a)(9)(C)(i).
Moreover, nothing on this record suggests that Cheruku has done anything other than pay all applicable taxes while employed here, and she clearly has a demonstrated skill in a highly specialized field that this country needs to be competitive in several important industries. (A.R. *210 263-69). In addition, Cheruku’s continued presence in this country does not portend any drain on social resources. In short, as her employer’s affidavit suggests, she appears to be exactly the kind of person the United States should welcome. (A.R. 258).
Cheruku did not enter the United States illegally. Rather, she arrived on a visitor’s visa, and then re-entered the country in 2002 pursuant to a grant of advanced parole. Although she overstayed her original visa, she later made a concerted effort to “play by the rules” by applying for advanced parole with the assistance of counsel.
Ironically, it seems quite likely that Cheruku only left the country in the first place because the United States gave her permission to return. The Government now seeks to remove her because she left the country after she applied for, and received, a document from the Government explicitly allowing her to leave. As the Immigration Judge quite correctly observed, the advanced parole document she was given was “at best a schizophrenic document,” because on one hand “[i]t says we’re going to allow you to do something, but then we might change our mind and not allow you to do it or something like that. You can always leave, but you might not be able to get back.” (A.R. 76).
Yet, as my colleagues explain, the statute says what it says and it is not our job to rewrite what Congress has decreed unless a literal application of the statute would “lead to a patently absurd result that no rational legislature could have intended.” Barrios v. Att’y Gen. 399 F.3d 272 (3d Cir.2005). Although I do not think that is the general case here and therefore do not dissent from the majority opinion, I nevertheless think that as applied to Cheruku, the result we reach today suggests the wisdom of Charles Dickens’ condemnation of the law that was uttered by Mr. Bumble in Oliver Twist.[2]
The majority correctly points out that Cheruku was technically placed on notice that her immigration status could be in jeopardy if she left the country because of the warning on her advanced parole document. That warning states:
NOTICE TO APPLICANT: Presentation of this authorization will permit you to resume your application for adjustment of status upon your return to the United States. If your adjustment application is denied, you will be subject to removal proceedings under section 235(b)(1) or 240 of the Act. If after April 1, 1997, you were unlawfully present in the United States for more than 180 days before applying for adjustment of status, you may be found inadmissible under section 212(a)(9)(B)® of the Act when you return to the United States to resume the processing of your application. If you are found inadmissible, you will need to quality for a waiver of inadmissibility in order for your adjustment of status application to be approved.
I am not at all sure that someone who is born in the United States and is fluent in English could comprehend this warning. I am far less certain that someone in Cheruku’s situation could. The language is confusing and ambiguous as the Immigration Judge explained. The phrase: “presentation of this authorization will permit you to resume your application,” (emphasis added), leads one to believe that Cheruku should indisputably have been able to pick up where she left off with her adjustment of status application once she returned to the United States. However, the warning then states, “you may be found inadmissi *211 ble” (emphasis added). The latter implies that Cheruku may not be admissible under some unknown statute, but just as equally implies that she may very well be found admissible. The fact that “will” precedes “may” could easily mislead a person to believe that his/her adjustment of status would not be adversely affected by a departure. The situation is further complicated by the fact that there is no explanation of what section 235(b)(1) or 240 of the Act or section 212(a)(9)(B)© mean. Nor is there any information about how these statutes could impact a person’s adjustment of status application. As a matter of law, Cheruku is, of course, charged with understanding the convoluted and hyper technical language on the form she received, but Mr. Bumble’s proclamation summarizes the reality of the situation.
Nevertheless, although I am troubled by our decision today, I am cautiously optimistic that our decision may not foreclose Cheruku’s ability to remain here nor deprive this country of her talents. On August 18, 2011, the Department of Homeland Security issued a letter and accompanying guidelines announcing that it plans to better focus its limited resources on deporting a more select (and appropriate) group of aliens. See DHS Letter to Senators Regarding Shift In Policy on Immigration Enforcement (Aug. 18, 2011), available at http://www.ilw.com/ immigrationdaily/news/2011,0819-pr osecutorialdiscretiompdf. Cheruku is not in the class of aliens that the Government’s immigration efforts will be focused on. Rather, DHS will now concentrate its resources on “enhancing border security and identifying and removing criminal aliens, those who pose a threat to public safety and national security, repeat immigration law violators and other individuals prioritized for removal.” Id. at 1. As part of this new strategy, DHS has initiated an interagency working group to “execute a case-by-case review of all individuals currently in removal proceedings to ensure that they constitute our highest priorities.” Id. at 2. I can only hope that Cheruku will be afforded such review and that the result will be favorable to her.
My optimism in that regard is buttressed by a memorandum issued by U.S. Immigration and Customs Enforcement proving guidance to “ICE” law enforcement personnel and attorneys for the exercise of discretion in removing aliens. See Memorandum Regarding Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency (June 1, 2011), available at http://www.ice.gov/doclib/secure-com munities/pdf/prosecutorial-discretionmemo.pdf. Some of the discretionary factors that ICE will consider include the person’s criminal history or lack thereof, whether the person is otherwise likely to be granted temporary or permanent status or other relief from removal, and the person’s length of presence in the United States. Although it is certainly not our place to tell an administrative agency how to apply its policies, I do note that it appears that Cheruku would qualify for a favorable exercise of discretion under the new policy given her lack of criminal background, her employer’s desire that she continue working as a software engineer, and her residence in the United States for the last 16 years.
As early as 1875, the Supreme Court discussed the value that immigrants bring to this country’s work force. The Court explained, “[i]n addition to the wealth which some of them bring, they bring still more largely the labor which we need to till our soil, build our railroads, and develop the latent resources of the country in its minerals, its manufactures, and its agriculture.” Henderson v. Mayor of City of New York, 92 U.S. 259, 270, 23 L.Ed. 543 (1875). Of course, times have changed greatly since then. The time for building *212 railroads has come and gone and the need for manual labor is now dwarfed by the need for expertise in the scientific and technological disciplines.
Nevertheless, the Court’s original premise is just as true today as it was 130 years ago. Indeed, given the rise of the “global village,” the interdependent nature of “national” economies, and the global competition in the marketplace, the need for highly specialized expertise is perhaps even greater now than the need for manual labor was when the Court made its observation in Henderson.
Given the finite resources of law enforcement and immigration officials, as well as overburdened immigration dockets, it is my hope that the Department of Justice may yet decide that Cheruku can remain in the United States and continue to function as a contributing member of this society.

. According to the 1-485 adjustment of status application, the petitioner’s full name is "Shireesha Reddy Cheruku,” not "Reddy Shireesha” as the IJ and BIA both stated in their respective decisions. (A.R. 82, 86). We will therefore refer to the petitioner by her last name, Cheruku.

. Mr. Bumble is the despicable character in Oliver Twist who said: "if the law supposes that, then the law is [absurd].” Bumble’s actual quote is far more expressive and irreverent.